Whitaker, Judge,
delivered the opinion of the court:
In May and June of 1944, plaintiffs entered into a number of contracts with the defendant to purchase salvage materials from various Army camps and hospitals in the Eighth Service Command of the Army, whose headquarters were in Dallas, Texas. They sue for breach of these contracts.
The contracts were for the purchase of salvage materials from the following camps: Ardmore Army Air Field, Bed Biver Ordnance Depot, Majors Army Air Field, Camp Fan-nin, Camp Maxey, Perrin Army Air Field, Camp Barkeley, Camp Bowie, Big Spring AAF Bombardier, and Ashburn General Hospital. The contracts were substantially the same. They provided for the purchase of three items. Item No. 1 consisted of “cooked grease, both clear and rough, including spent frying fats.” Item 2 consisted of “bones and raw meat trimmings, spoiled meats (will consist of meat trimmings, cooked bones, cracklings, poultry heads, feet, and entrails).” Item 3 consisted of “trap grease from interceptors (treated) or (untreated).” The contracts also contained Item No. 4 which consisted of “kitchen waste fit -for animal food, excluding grease, bones, and raw meat trimmings.” However, plaintiffs did not bid on Item 4, and there is no controversy as to Items 1 and 3. The only controversy is relative to Item 2, which consisted of, to repeat, “bones and raw meat trimmings, spoiled meats (will consist of meat trimmings, cooked bones, cracklings, poultry heads, feet, and entrails).”
Plaintiffs do not contend that the Item 2 materials which they received differed from those described in Item 2 of the contract, but they say that they varied considerably from the things received under Item 2 under prior contracts which *453 they had had with the defendant, and that they had assumed they would be substantially the same. Prior to the present contracts, which went into effect on July 1, 1944, plaintiffs had had contracts for the purchase of salvage,rnaterials from the Gainesville Army Air Base, Advanced Flying School, Frederick, Oklahoma, Ashburn General Hospital, Camp Barkeley, Camp Bowie, Camp Fannin, Camp Howze, Camp Maxey, and Perrin Field. All of these contracts expired on July 1, 1944. The new contracts were for the purchase of salvage materials after that date and for the duration of the war and six months thereafter, or for a period of three years, whichever was less.
The old contracts under Item 2 described the materials to be received as “raw bones and raw meat trimmings.” The description in the new contracts varied therefrom in that it consisted not only of raw bones, but also of cooked bones, and of cracklings, and also of poultry heads, feet, and entrails. Cracklings are the material that is left after bones and meat have been rendered and a large part of the fat and grease extracted therefrom.
Under the old contracts, plaintiffs did not ordinarily receive cooked bones. These ordinarily went to the person who purchased the Item 4 materials consisting of kitchen waste. Sometimes under the old contracts plaintiffs did receive cooked bones, but they were not required to pay for them. Under the new contracts they received a great deal of them and they were required to pay for them. This is one of the grounds of plaintiffs’ complaint, but it seems clear that this ground of complaint is without foundation because the new contracts expressly stated that some of the materials under Item 2 would consist of cooked bones.
Plaintiffs also contend that under the old contracts there had been no rendering of the bones and meat before the materials were delivered to them, but that under the new contracts they had been rendered at the camps and most of the fat extracted, and that the plaintiffs received only what was left. However, plaintiffs were put on notice that there would be some rendering of the fats under the new contracts by the use of the word “cracklings.” As stated above, cracklings are *454 what is left after the meat and bones have been rendered and most of the fat extracted therefrom.
The new contracts were executed while the war with Germany and Japiyi was in progress. Fats were used in the manufacture of glycerine and were essential to the war effort, and the United States Government, including the Army, was undertaking to conserve them. Accordingly, on March 29, 1944, Lt. Col. Edward F. Wilson, who was the Director of the Division of Salvage and Redistribution at the Headquarters of the Eighth Service Command, Dallas, Texas, wrote the commanding officers of the various camps, stations and command posts throughout the area relative to the execution of new contracts for the sale of salvage materials, to take the place of those which would expire on July 1, 1944. In paragraph 4 (b) of his letter he said:
Bones and trimmings. — The increasing importance of the recovery of nutrients from bones and raw meat trimmings by treatment in kitchens will considerably modify the material formerly turned over to contractors as “bones and raw meat trimmings.” This item should be offered for sale as indicated in Item 2 on the Continuation Schedule. It is not contemplated that bidders will offer as much for this item as was formerly received when nutrients and fats were not removed from bones and meat trimmings.
Following these instructions, the new contracts entered into by the various camps and posts described the materials to be received under item 2 differently from the way these items had been described under the old contracts. Whereas the old contracts called for “raw bones and raw meat trimmings,” the new contracts called for “bones and raw meat trimmings, spoiled meats (will consist of meat trimmings, cooked bones, cracklings, poultry heads, feet, and entrails).”
Under the organization of the Eighth Service Command one set of officers had charge of handling food in the kitchens, and another set of officers had charge of the disposition of salvage from the kitchens. The Assistant Quartermaster Director of Food Service had general supervision of what was done in the kitchens. The Assistant Quartermaster Director of Food Service at the Headquarters of the Eighth Service Command also issued a letter to all posts and camps *455 relative to the conservation of fats. This letter, dated April 18, 1944, read in part as follows:
I. Fat Conservation — General.
In the interest of food conservation and due to the monetary savings to be realized, it is essential that a program for the proper handling and rendering of excess fats be instituted and energetically followed at your station if such has not, to date, been accomplished.
II. Methods of Rendering.
1. Becommended methods which are currently being employed and the results of each are described below:
a. Rendering in Individual Kitchen. — This is the most common method. Excess fat is trimmed and rendered in. each individual kitchen and each mess sergeant utilizes his own supply.
h. Central Rendering Plant. — A central rendering plant may be established, using only salvaged materials to make the installation. Excess fats are to be collected from all mess halls daily and are delivered to the central plant. A sixty-gallon steam-jacketed kettle and an obsolete bain-marie may be installed in a kitchen or other appropriate building not being used. Excess fats can then be trimmed, ground, and rendered in the steam-jacketed kettle., drained into the bain-marie for cooling, and packaged in thirty-gallon GI cans or other suitable containers. When cooled, the rendered fats may be stored in available refrigeration facilities. This method is recommended if personnel and facilities can be made available.
c. Central Meat Cutting and Rendering Plant. — One station, operating a central meat cutting and rendering plant, does not issue any shortening or lard to messes, and during the past three months has not only supplied all of the messes with their fat requirements but has also accumulated a surplus that has been shipped to other stations.
Whereas Colonel Wilson, the Director of Salvage, in his letter of March 29, 1944, contemplated the salvaging of fats “by treatment in kitchens,” the Director of Food Service had in mind going beyond this in some cases. In his letter of April 18, under recommended “methods of rendering,” he mentioned first “^Rendering in Individual Kitchen,” but then he went on further to recommend a “Central Rendering Plant” where the personnel and facilities therefor were avail *456 able, or, a “Central Meat Cutting and Rendering Plant” where this could be done.
At Camp Bowie a central rendering plant was set up; at another camp it was attempted but abandoned for lack of the necessary facilities. Practically all of the rendering was done in the individual kitchens. However, this gives plaintiffs no cause for complaint, because they were put on notice that rendering would be done by the provision of the contract that some of the materials plaintiffs would receive would be “cracklings,” which are the remains after most of the fat has been extracted. Moreover, kitchen rendering had been done at several of the camps under the old contracts, and this plaintiffs must have known.
But, all this aside, the decisive fact in the case is that at all the camps where plaintiffs had had contracts, the quality of the materials delivered to plaintiffs after July 1,1944, the effective date of the new contracts, was substantially the same as the quality of the materials delivered under the old contracts. The salvage officers or the contracting officers at each of the camps so testified, or it was stipulated that they would so testify if called to the stand. See Tr. 546-551, 555, 667-670, 680-695,708-712, 718-721. The salvage officer at Camp Bowie, where a central rendering plant was set up, testified (Tr. 555-556) :
7. Q. Now, as salvage officer, did you have knowledge of the materials that plaintiff was receiving under its old contract, that is, prior to July 1944 ?
A. Yes, sir. The central collection point for all waste was at the salvage yard and everything sold on contract was delivered to the contractors at the salvage yard.
8. Q. And did you have opportunity to have knowledge of the materials received under item two of the new contract in Exhibit 6 ?
A. Yes, sir.
9. Q. Was there any substantial difference between the items received under the old contract and the new contract ?
A. There was a difference in the quantities delivered, but was varied from time to time, but the class of material for which the contract was assigned for didn’t differ.
10. Q. I didn’t get the last word.
A. There was no difference in the quality of material that was delivered to the contractor but there was a dif *457 ference in the quantity because that fluctuated depending on the strength of the camp.
The rest of the testimony is to the same effect.
Plaintiffs say that when they entered into the new contracts, they assumed the same practices would be followed in the future as had been followed in the past, but that this was not done. The testimony of every one of the contracting officers or salvage officers shows that it was done. Concededly, nothing was done that violated the provisions of the new contracts.
We, therefore, are led to the conclusion that plaintiffs have no just cause for complaint and that their petition must be dismissed. We arrive at this conclusion notwithstanding the testimony of Colonel Wilson who was the Director of Salvage of the Eighth Service Command. He was of the opinion that plaintiffs had been badly treated, but he had no personal knowledge of the facts, except as related to him by plaintiffs and except for one inspection of the salvage material delivered to the plaintiffs at one camp, out of the many, on only one occasion. The testimony of every officer who had personal knowledge of the facts shows that plaintiffs received the same quality of material under the new contracts as they had received under the old contracts, except as to the cooked bones.
Plaintiffs’ petition is dismissed. It is so ordered.
Howell, Judge; Madden, Judge; and Littleton, Judge; concur.
Jones, Chief Judge, took no part in the decision of this case.